### In re BENEVOLENT AND PROTECTIVE ORDER OF ELKS, BROOKLYN LODGE NO. 22.

No. 24448.

District Court, E. D. New York.

Feb. 14, 1935.

See, also, 3 F. Supp. 559.

Newman & Bisco, of New York City (Ralph A. Woodend, of New York City, of counsel), for trustee for bondholders.

Strongin & Hertz, of Brooklyn, N. Y. (Milton Hertz and Charles Wilson, both of Brooklyn, N. Y., of counsel), for trustee in bankruptcy.

BYERS, District Judge.

This is a petition to review an order of the referee in bankruptcy, expunging the claim of Manufacturers Trust Company, in the sum of $2,711,649.98, based upon a deficiency judgment recovered in the New York Supreme Court, in foreclosure bearing date May 12, 1933. On May 2, 1933, a petition in bankruptcy was filed against the mortgagor, and that was one day after the sale pursuant to judgment of foreclosure bearing date of January 16, 1933.

Promptly upon the filing of the petition, a receiver was appointed, who qualified on May 2, 1933, and on June 1, 1933, he was appointed and qualified as trustee.

The trustee was not made a party to the action in foreclosure.

The mortgage was given December 1, 1926, to the claimant, in the sum of $2,-900,000.00, to secure an issue of bonds, and the amount due at the time of the foreclosure judgment was $2,687,771.20.

The sale was had as stated on May 1, 1933, by public auction in accordance with the usual practice, and after due advertisement; and the plaintiff was the only bidder, and thus became the purchaser.

The figures entering into the computation of the deficiency appear in the referee's report of May 12, 1933, and need not be here recited. The fact is that the deficiency was stated and judgment entered as above set forth, twelve days after the filing of the bankruptcy petition.

The trustee asserts that the claim should not be allowed, and that he is not concluded from making this objection by the mere fact that the deficiency judgment has been docketed as above set forth. In this contention the referee agrees, and it is that conclusion which is assailed by the creditor as a matter of law. Its position is that the trustee may not be heard to attack the judgment collaterally, and that the debt is provable under section 63 of the Bankruptcy Act (11 USCA § 103), being a fixed liability, evidenced by a judgment, absolutely owing at the filing of the petition, whether then payable or not.

From what has been said concerning the dates of filing the petition and the entry of the deficiency judgment, it is apparent that the latter was not a fixed liability on the 2nd day of May, 1933.

This must be so, because, when the petition was filed on that day, it was not known what the deficiency amounted to in dollars and cents; in fact, the referee's extra allowance was not fixed until May 11, 1933. It was open to the mortgagee not to file and docket any deficiency judgment whatever, and until it did so on May 12, 1933, there was no debt evidenced by a judgment, within the fair meaning of section 63 of the Bankruptcy Act.

The right and duty of the trustee to seek such relief on behalf of the unsecured

creditors, as has been accorded to him by the referee, has been recognized in many cases. See: In re Soltmann (D. C.) 238 F. 241, affirmed Id. (C. C. A.) 249 F. 455; In re Dix (D. C.) 176 F. 582; In re Davis (C. C. A.) 174 F. 556; Matter of Tietenberg, 15 A. B. R. (N. S.) 580; In re Kenwood Storage & Warehouse Corp. (D. C.) 4 F. Supp. 561.

In the Davis and Tietenberg Cases, the trustee was made a party to the foreclosure proceedings, which would render his position, in objecting to the claim on deficiency, more vulnerable, perhaps, than if he had not been so joined.

The claimant relies upon In re Falsone (D. C.) 247 F. 607, which involved a similar claim arising out of a foreclosure to which the trustee was a party. That is not the case here; moreover the decision is at variance with that in the Tietenberg Case, supra, decided in this circuit, so far as the right of the trustee is involved, to have the value of the mortgage determined in order that the unsecured amount owing, if any, to the creditor be established.

It is distinctly stated in the Soltmann Case that the failure to join the trustee in the foreclosure action so operated that the deficiency judgment was not binding upon him, and was not therefore proof of the amount of the unsecured claim of the mortgagor. The affirmance of that decision established the rule which is binding upon this court, and the referee therefore was correct in his ruling on the question of law.

It now becomes necessary to examine into the question of the value of the mortgage on the day of the filing of the petition.

The mortgage is a prior lien on the building and premises occupied by the bankrupt as a lodge and club building at the corners of Livingston street, Boerum place, and Schermerhorn street, in Brooklyn.

The land is about 160 feet in front on the streets named, and 187 feet on Boerum place, with an irregular interior line of about 183 feet.

The building covers the entire plot, and was erected in 1928. It is fourteen stories high, of first class brick, steel and stone construction, and the architects were McKim, Mead & White. It was designed for occupancy as a club, and contains more than two hundred sleeping rooms in addition to the many facilities of a new building intended for club occupancy and operation.

The cost of the building and equipment other than furnishings was $3,873,737.00.

The cost of the land is not clearly stated in the testimony, but the two experts gave their opinions as to May 1, 1933, value, as follows: For the trustee, $586,-000.00, and for the claimant, $469,700.00. The mean of these is $527,850.00.

The claimant's expert valued the property as a whole, land and building, at $1,-200,000.00.

The trustee's expert gave it as his opinion that the total value was $2,911,000.00, of which the value of the building and equipment was $2,325,000.00.

The claimant's expert valued the building at $830,300.00, although he insisted that the sum of his figures for the land and building was $1,200,000.00, while in fact they are $1,300,000.00.

It will be seen that the major difference of opinion lies in the value of the building, the margin being $1,494,700.00.

The difference between the cost of the building and its equipment, and the value assigned to it by the trustee's expert will be seen to be $1,548,737.00, or almost 40 per cent. of that cost, which seems to be a generous allowance for depreciation upon the plant as a whole.

The building value as estimated by the trustee's expert, of $2,325,000.00, is to be compared with the claimant's own appraisal made June 1, 1933, for fire insurance purposes, of $2,856,471.00.

It may be assumed that there was no tendency toward understatement in the compilation of the latter value, but it cannot be wholly excluded in considering the testimony of the expert called by the trustee, before the referee. Incidentally the appraisal for insurance assigns a land value of $543,360.00 to the property, and this is in excess of the average of the said two opinions on that subject.

The claimant's expert valued the building at $830,300.00 because it is a special property, not readily adaptable to purposes other than that for which it was designed and built. But his figures are not supported by data of the cost of reconstruction, nor is it possible to test the processes leading to his conclusion by anything which appears in the record or in the written appraisal which he submitted, save reflections

that would apply to any club property, at any time.

The difficulty of reaching a satisfactory conclusion concerning "value," in such matters, is discussed in a thoughtful essay in the "Columbia Law Review" for December, 1934, entitled "The valuation of real estate". It does not present the answer to the problem here involved, but it does reconcile the reader to such a conflict in opinion as is reflected in the testimony now under examination.

There is such a justification for difference of approach, that the views presently held will be stated briefly, in order that a reviewing court may see that the issue has not been avoided.

It is thought that arguments directed to the instability of this form of security, as collateral to the bonds issued by the corporate mortgagee, are not determinative of this controversy. While a club building may have been of more questionable value as security in 1933, than in 1926 when the loan was placed (the date of issuance of the bonds does not appear) by reason of drastic economic conditions, the difference was in degree, not principle.

When this loan was placed, it was obviously to be secured by property which was known to be available only for restricted use. That was within the contemplation of the claimant when it made the loan, and must be equally held to have been within the contemplation of those who purchased the bonds. If the claimant and those who bought the bonds were satisfied with that type of security, then it seems fair that the value of the mortgage should be estimated as a lien upon club property; and that the latter should be appraised as such, and not as something into which it might be converted by the expenditure of an unknown sum of money.

This is another way of saying that, if the claimant's expert's opinion were to be accepted, it would follow that the mortgage at its inception was never worth more than $1,300,000.00 because the security was always that of a club property, which was never worth more than about 30 per cent. of the actual investment.

It is not believed that this theory is so plausible as to compel acceptance.

The problem is not unlike that presented in People ex rel. N. Y. Stock Exchange, etc., v. Cantor, 221 App. Div. 193, 223 N. Y. S. 64, affirmed 248 N. Y. 533, 162 N. E. 514, in which an assessment for taxation purposes was sought to be reduced because of the special use to which the building in question was necessarily restricted. The court confirmed an assessment for 1921 upon the New York Stock Exchange building completed in 1903, apparently upon the theory (page 197 of 221 App. Div., 223 N. Y. S. 64) that the reproduction cost on the tax day, less depreciation, would yield a value at least as high as that established by the tax commissioner. The court said that cost figures had been resorted to, in order to fix the full value in reference to the Union Club, in People ex rel. Union Club v. O'Donnel, 126 App. Div. 916, 110 N. Y. S. 1141.

There is no evidence in this record of reproduction cost, but the cited cases are considered as vindicating the theory that property involved should be valued upon an intrinsic basis.

If this building, which cost $2,855,174.-00 exclusive of plumbing, heating, lighting, refrigeration, and elevator equipment, were depreciated 20 per cent., or 5 per cent. per year (as contrasted with the permissible allowance for income tax purposes) between completion and bankruptcy, the result would be a figure of $2,284,139.00 as the depreciated value of the bare building; if to that were added the claimant's opinion of the land value, of $469,700.00, the total would be $2,753,839.00, or $15,896.27 in excess of the principal and interest due on the mortgage on May 2, 1933.

It is believed that such a figure would be the lowest which could be accepted under the testimony, as the value of the security on the date of bankruptcy.

It necessarily follows that the trustee's objection to the claim is sound, and that the referee's decision is supported by credible testimony, and that the petition to review should be denied.

Settle order.